# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Davion Dequell Evans,<br><br>Defendant. | Case No. 16-cr-0140 (MJD/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Thomas Calhoun-Lopez, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for United States of America

Douglas Olson, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for Davion Dequell Evans

HILDY BOWBEER, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motions hearing on July 1, 2016. The case has been referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. In this Report and Recommendation, the Court will address Defendant Davion Dequell Evans' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 25] and Motion to Suppress Statements, Admissions, and Answers [Doc. No. 26]. The parties' nondispositive motions were addressed in a separate Order [Doc. No. 41]. For the reasons set forth below, the Court recommends that the motion to suppress evidence be denied and the motion to suppress statements be denied in part and denied as

moot in part.

## I.      Procedural Background

On May 17, 2016, Davion Dequell Evans was charged by Indictment with

Possession of a Firearm with an Obliterated Serial Number, in violation of 18 U.S.C.

§§ 922(k) and 924(a)(1)(B).  (Indictment [Doc. No. 13].)  Evans timely filed pretrial

motions, including the motions to suppress, on June 16, 2016.  He originally sought to

suppress a firearm obtained during a warrantless detention, arrest, and search on February

10, 2016; and statements he made on the scene and later at the jail.  Evans clarified at the

beginning of the July 1, 2016, pretrial motion hearing that he was not arguing his

statements were involuntary, only that his statements were the product of an illegal search

and seizure.  (Mot. Hr'g Tr. ("Tr.") at 16 [Doc. No. 44].)  Evans conceded his statement

at the jail was voluntary and provided after a *Miranda* warning.  (*Id.*)

At the July 1 hearing, the Government submitted three exhibits into evidence:

a photograph of a red car, license plate 571 TXP (Gov't Ex. 1); a photograph of two

firearms (Gov't Ex. 2); and a recorded statement (Gov't Ex. 3).  Minneapolis Police

Officers Kenneth Tidgwell and Danielle Evans testified for the Government.  The parties

asked for time to file post-hearing memoranda on the suppression issues, and the Court

granted them leave to do so.  Evans filed his memorandum on July 27, 2016 [Doc.

No. 45], and the Government filed its memorandum on August 2, 2016 [Doc. No. 46].

The Court took the motions to suppress under advisement at that time.

## II.     Relevant Facts

A few minutes before 8:00 p.m. on February 10, 2016, Minneapolis police

dispatch received multiple 911 calls reporting that gunshots had been fired in the 800 to 900 block of North Sheridan Avenue in Minneapolis. (Tr. at 18-20, 37.) One caller also reported a red car speeding away from the scene, but the caller did not say the gunshots came from the car. (Tr. at 20, 38.) Officer Tidgwell and his partner were in the area and responded to the call. (Tr. at 20-21.) As they approached the area, a police dispatcher reported that a police recruit squad car had stopped a red car with multiple passengers. (Tr. at 20-22.) As Officer Tidgwell drove northbound on North Sheridan Avenue, he saw a red vehicle detained at the north end of the 800 block. (Tr. at 22.) The car was parked haphazardly near the curb, with the tail end extending into the street and obstructing traffic. (Tr. at 23, 39.) Officer Tidgwell did not know whether the vehicle was already parked that way when officers first arrived, but a police report by the officers initiating the stop established that the vehicle was parked illegally when officers first encountered it. (Tr. at 23, 48.) Officer Tidgwell saw five males in the vehicle, two in the front and three in the back. (Tr. at 24, 39-40.)

The five officers at the scene briefly conferred and decided to remove the occupants one at a time. (Tr. at 24, 27.) This decision was based on several facts: the red vehicle matched a description of the vehicle seen speeding away from the area where gunshots were fired; the vehicle was stopped very near the crime scene; the officers were concerned with the number of individuals in the car and the one-to-one ratio of occupants to officers; the officers were concerned with the possibility of crossfire; very little time had passed between the stop and the 911 calls; and there was known gang activity and gang members living on the block. (Tr. at 24-25, 27.)

The driver was removed first, frisked, handcuffed, and taken to a squad car. (Tr. at 26.)  Evans was sitting in the rear, right-side passenger seat.  (Tr. at 25.)  Officer Tidgwell approached Evans' side of the car and told Evans to show his hands.  (Tr. at 42.)  Officer Tidgwell then ordered Evans out of the car and immediately handcuffed him. (Tr. 26, 42-43.)  As he escorted Evans to a nearby squad car, Officer Tidgwell noticed Evans was walking strangely, slowly and holding his knees together.  (Tr. at 29-30.)  Officer Tidgwell found this "suspicious" and "odd," raising a concern that Evans could be concealing something in his crotch.  (Tr. at 30.)  Evans was also animated and nervously rambling about an altercation and being shot at.  (Tr. at 30, 32.)

Once they reached the squad car, which was parked about fifteen feet from the suspect vehicle, Officer Tidgwell began a pat-down search of Evans and asked if he was armed.  (Tr. at 31, 44.)  Officer Tidgwell asked the question in light of the reported gunshots and Evans' comments about the altercation and being shot at.  (Tr. at 31.)  Evans did not respond, but his demeanor changed from talkative to reserved.  (Tr. at 32, 44.)  Officer Tidgwell continued the pat-down search and felt a hard object in Evans' crotch, which, based on his training and experience, Officer Tidgwell immediately recognized as a gun.  (Tr. at 28-29.)  Officer Tidgwell has been a police officer since 1999 and has worked in areas with high rates of gun- and gang-related crime for the past seven years.  (Tr. at 18.)  He has encountered numerous individuals with firearms hidden in their crotch areas and knows that guns are frequently concealed there.  (Tr. at 28-29.)

Upon feeling the firearm, Officer Tidgwell stated, "You do have a gun."  (Tr. at 32.)  He maintained his grip on the gun and called his partner over to assist him.  (Tr. at

4

30-31.)  Even though Evans was handcuffed, Officer Tidgwell was conscious that other individuals were still being removed from the suspect vehicle.  (Tr. at 30-31.)  Evans said the firearm was his and he carried it for protection.  (Tr. at 32.)  Officer Tidgwell's partner put on gloves and removed the gun from Evans' underwear.  (Tr. at 31, 46.) After the gun was removed, Officer Tidgwell noticed the serial number had been scratched off the weapon.  (Tr. at 35.)  Officer Tidgwell also asked Evans if he had a permit to carry a concealed weapon and if he was on probation.  (Tr. at 32-33.) The entire interaction took less than a minute.  (Tr. at 31.)

The firearm seized from Evans was a .380 Taurus semi-automatic firearm with an obliterated serial number.  (Tr. at 34-35.)  Officers found a similar gun hidden in the dashboard of the vehicle.  (Tr. at 34.)

Evans was arrested and transported to jail.  (Tr. at 35.)  The next day, he was interviewed at the jail by Officer Danielle Evans.  (Tr. at 50.)

## III.    Motion to Suppress the Gun

Evans argues that the initial stop of the car, his forced removal from the car, and his detention, pat-down search, and arrest were unconstitutional.

Beginning with the stop of the vehicle, the Court finds that the police were justified in stopping the car because they reasonably suspected it was involved in the reported gunfire.  "A law enforcement officer may conduct an investigative stop of a vehicle if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot."  *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012) (quotation and internal quotation marks omitted).  Courts must "consider the

totality of the circumstances when determining whether an officer has a particularized and objective basis to suspect wrongdoing." *Id.* Officers may rely "on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Although an officer may not rely on a mere hunch, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274 (citations omitted).

Here, the officers who stopped the red vehicle knew of multiple, recent 911 calls reporting gunshots in the 800 to 900 block of North Sheridan Avenue and that one caller had reported a red car speeding away from the scene. The first officers to arrive at the scene saw a red car parked haphazardly and illegally at the north end of the 800 block of North Sheridan Avenue. These circumstances— the matching description of the vehicle and the geographic and temporal proximity of the car to the reported gunshots—created a reasonable suspicion to believe that the occupants of the car were involved with criminal activity. *See United States v. Roberts*, 787 F.3d 1204, 1210 (8th Cir. 2015) (finding reasonable suspicion when an officer heard over a radio transmission that a black Chrysler could have been involved in a recent shooting blocks away); *United States v. Witt*, 494 F. App'x 713, 716 (8th Cir. 2012) (finding reasonable suspicion based on a radio dispatch generally describing the vehicle, the fact that the car was driving away from the crime scene, and the distance the car could have traveled since the criminal activity); *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998) (finding

reasonable suspicion based on "the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop").[1]

Turning to the removal of Evans from the vehicle and placing him in handcuffs, the Court finds these actions were justified under the circumstances. There is "no 'litmus-paper test' or 'sentence or paragraph' rule to determine when, given the 'endless variations in facts and circumstances,' police-citizen encounters exceed the bounds of mere investigative stops." *United States v. Jones*, 759 F.2d 633, 636 (8th Cir. 1985) (quoting *Florida v. Royer*, 460 U.S. 491, 506-07 (1983)). Generally, "officers may take such steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo' so that the limited purposes of the stop may be achieved." *Id.* at 636-37 (quoting *United States v. Hensley*, 469 U.S. 221 (1985)). It is well-established that "police officers may reasonably handcuff a suspect and place him in a squad car during the course of a *Terry* stop in order to protect their safety and maintain the status quo." *United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2011).

In this case, officers had a reasonable suspicion that the five occupants of the red vehicle had very recently been associated with gunshots fired in the immediate vicinity. There were five occupants in the vehicle and five responding officers. The officers

---

[1] Alternatively, the officers were justified in stopping and briefly investigating the red vehicle because it was parked illegally and obstructing traffic. "Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006). The police report completed by the officers who initiated the stop established that the vehicle was already parked illegally when they encountered it, not that it was parked illegally as a result of the stop.

decided to remove the occupants of the vehicle for personal safety and to maintain the status quo while they investigated the suspected criminal activity. Officer Tidgwell's decision to remove Evans from the vehicle and handcuff him was warranted by the nature of the criminal activity (gunfire), the one-to-one ratio of occupants to officers, the location of the vehicle near the crime scene and in a neighborhood known for gang activity, the possibility of crossfire, and the short amount of time between the gunshots and the stop of the vehicle.

The Court finds that Officer Tidgwell's pat-down search of Evans was also lawful. To justify a protective frisk for weapons, "the officer must have reasonable, articulable suspicion that the suspect is armed and dangerous." *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir.), *cert. denied*, 136 S. Ct. 376 (2015). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). In addition to the circumstances recounted above, Officer Tidgwell noticed Evans walking strangely, as though he was concealing something in his crotch, and heard Evans make unsolicited comments about an altercation and being shot at. Officer Tidgwell did not exceed the scope of the stop by conducting a pat-down search for weapons.

Finally, with respect to Evans' arrest, the Court finds the arrest was supported by probable cause. "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Fisher v. Wal-Mart Stores, Inc.*,

619 F.3d 811, 816 (8th Cir. 2010).  Officer Tidgwell had probable cause to arrest Evans after he seized the gun from his person and saw that the serial number had been obliterated.

## IV.    Motion to Suppress Statements

Evans argues that his statement made in response to Officer Tidgwell's comment "you do have a gun" must be suppressed because the officer's comment was the functional equivalent of interrogation and not preceded by a *Miranda* warning or waiver. (Def.'s Mem. Supp. Mot. Suppress at 7-8.)  He also argues the statement was the direct result of an unlawful stop and seizure.

Taking the latter argument first, the Court has concluded in Part III that the stop and seizure of Evans were lawful.  Thus, his statement was not the product of an unconstitutional search and seizure.

Although Evans does not expressly seek suppression of the unsolicited statements he made while Officer Tidgwell escorted him to the squad car and began the pat-down search, the Court will address the statements as a cautionary measure.  The rambling statements Evans made before Officer Tidgwell said "you do have a gun" were voluntary, spontaneous utterances that need not be suppressed.  *See Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989).  The statements were not made in response to interrogation or any conduct that Officer Tidgwell should have known would be "reasonably likely to elicit an incriminating response."  *See United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985).

The crux of Evans' motion to suppress statements is his statement to Officer Tidgwell that the gun was his and he carried it for protection, after Officer Tidgwell stated

"you do have a gun."  Evans argues that he was in custody and Officer Tidgwell's

statement was the functional equivalent to interrogation.[2]

Under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming

from custodial interrogation of the defendant unless it demonstrates the use of procedural

safeguards effective to secure the privilege against self-incrimination."  384 U.S. 436,

444 (1966).  Those procedural safeguards are met when, "[p]rior to any questioning, the

person [is] warned that he has a right to remain silent, that any statement he does make

may be used as evidence against him, and that he has a right to the presence of an

attorney, either retained or appointed."  *Id.  Miranda* warnings are required for official

interrogations where a person has been "taken into custody or otherwise deprived of his

freedom of action in any significant way."  *Stansbury v. California*, 511 U.S. 318, 322

(1994).

There is no dispute that Evans was in custody when he said the gun was his and he

carried it for protection.  He was removed from a vehicle, handcuffed, escorted to a squad

car, and clearly not free to leave.  Thus, the question for the Court is interrogation.

*Miranda* warnings are required only when an individual is subject to interrogation.

---

[2]  Evans does not argue Officer Tidgwell was required to *Mirandize* him before Officer
Tidgwell initially inquired, as he began the pat-down search, whether Evans was armed.
During a protective frisk, it is permissible for an officer to ask if the individual has any
weapons on his person.  *See United States v. Hernandez*, 751 F.3d 538, 541 (7th Cir.),
*cert. denied*, 135 S. Ct. 503 (2014) (reasoning, under the public safety exception, that
"questions designed to prevent officers from hurting themselves during a search of the
suspect's person are permitted").  "Accordingly, a search of his person and items in close
proximity is necessary, and a question about what an item on his person contains is a
narrow, practical way of ensuring officer safety during the immediate and inevitable
search of the item."  *Id.*

*United States v. Nguyen*, 608 F.3d 368, 374 (8th Cir. 2010).  "Interrogation . . . must reflect a measure of compulsion above and beyond that inherent in custody itself."  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  "Interrogation" under *Miranda* means not only "express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* at 301.  Although the latter definition focuses on the suspect's perspective, "the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."  *Id.* at 302.  In other words, police officers "cannot be held accountable for the unforeseeable results of their words or actions"  *Id.* at 301-02.  "Whether a particular statement constitutes an interrogation depends upon the circumstances of each case, but we generally do not find a mere factual statement to be an interrogation where it serves to inform the suspect as to the status of his case or the investigation into his activities."  *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005).

Evans contends that Officer Tidgwell's comment "you do have a gun" was interrogation.  The Court disagrees.  Officer Tidgwell made the comment when he felt the gun during the pat-down search of Evans.  He immediately recognized the object as a gun and said so.  Officer Tidgwell's statement was merely a statement of fact that served to inform Evans of the status of the pat-down search.

The police officer's statement in *Hull* presented a much closer question than Officer Tidgwell's statement, yet the Eighth Circuit Court of Appeals found the statement

did not elicit an incriminating response.  *See Hull*, 419 F.3d at 766-67.  The officer told

Hull that he was leaving the scene to execute a search warrant at Hull's sister's home.

419 F.3d at 766-67.  The Eighth Circuit determined that the statement "was merely a

statement of fact concerning the status of the investigation against Hull and not a plea to

Hull's conscience."  *Id.* at 767.  In the present case, there is nothing about Officer

Tidgwell's statement that could be interpreted as a plea to Evans' conscience or other

provocation of an incriminating response.

      *Innis* itself also lends support to this conclusion.  There, one officer remarked to

another officer in front of the suspect that "it would be too bad if the little [girl] . . .

would pick up the gun, maybe kill herself," and the suspect told the officers he would

show them where the gun was located.  *Innis*, 446 U.S. at 295.  The Supreme Court found

that "a few off hand remarks" did not provoke the suspect to make a self-incriminating

response.  *Id.* at 303.  Although Officer Tidgwell's remark "you do have a gun" was

made directly to Evans rather than to another officer, *Innis*'s reasoning nonetheless

applies.  As in *Innis*, "[t]his is not a case where the police carried on a lengthy harangue

in the presence of the suspect.  Nor does the record support the . . . contention that, under

the circumstances, the officers' comments were particularly 'evocative.'"  *Id.*

      Under the facts and circumstances at hand, the Court concludes that Officer

Tidgwell should not have known that his statement was reasonably likely to elicit an

incriminating response.  Accordingly, Evans' statement that the gun was his and he used it

for protection should not be suppressed.

      The final issue for resolution raised by Evans' motion to suppress statements is

Evans' response to Officer Tidgwell's questions about whether he was on probation and whether he had a permit to carry a concealed weapon.  The Government represented in its post-hearing memorandum that it will not use these statements at trial.  (Gov't's Mem. Opp'n Mot. Suppress at 8 [Doc. No. 46].)  Based on this representation, this aspect of Evans' motion should be denied as moot.

Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant Davion Dequell Evans' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 25] be **DENIED**; and

2.     Defendant Davion Dequell Evans' Motion to Suppress Statements, Admissions, and Answers [Doc. No. 26] be **DENIED** in part and **DENIED AS MOOT** in part, as set forth fully herein.

Dated: August 17, 2016                  _s/ *Hildy Bowbeer*_____
                                         HILDY BOWBEER
                                         United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being

13

served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.